```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                      CASE NO. 22-CR-60242-AHS-1
3
   UNITED STATES OF AMERICA,
4                                       Fort Lauderdale, Florida
                    Plaintiff(s),
5                                       December 2, 2022

6          vs.

7  TSVIA KOL,

8                  Defendant(s).      Pages 1 - 51
   -----------------------------------------------------------
9                          DETENTION HEARING
               TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10              BEFORE THE HONORABLE CHRIS M. MCALILEY
                   UNITED STATES MAGISTRATE JUDGE
11
   APPEARANCES:
12
   FOR THE PLAINTIFF(S):  ALEXANDRA COMOLLI, ESQ.
13                        UNITED STATES ATTORNEY'S OFFICE
                          9 NE 4th Street
14                        Miami, FL 33131
                          305-961-9303
15                        alexandra.comolli@usdoj.gov

16

17 FOR THE DEFENDANT(S):  JASON W. KREISS, ESQ.
                          1824 SE 4th Avenue
18                        Fort Lauderdale, FL 33316
                          954-525-1971
19                        jwk@kreisslaw.com

20

21 TRANSCRIBED BY:        Joanne Mancari, RPR, CRR, CSR
                          Court Reporter
22                        jemancari@gmail.com

23

24

25
```

1    Thereupon,

2    the following proceedings were held:

3         THE COURT:  In a moment I will call each defendant one

4    at a time to the podium and I will speak to you about your

5    case, but before I do that I want to advise you of certain

6    legal rights that you have in this court.

7         First, you have the right to be represented by an

8    attorney.  If you have the financial means to hire a lawyer,

9    that is your job.  If you are financially unable to do that,

10   you will be able to tell me that and I will have you sworn to

11   tell the truth and then I will ask you questions about your

12   finances so that I can decide if the law permits me to appoint

13   an attorney to represent you at no cost to you.

14        Because I will be asking you some questions, I want to

15   explain your Fifth Amendment right against self-incrimination.

16        You have the right under our Constitution to not be

17   compelled by the government to incriminate yourself, that is,

18   to give information to the government that helps the government

19   prosecute you.  If you were to say something in court today

20   that the government heard and your words helped the government

21   prosecute you, the government could take your words and use it

22   as evidence against you, and you have the right to not be

23   compelled to do that.

24        So when I ask you some questions, if you think that

25   your answer to any of my questions might show you have

1    committed a crime, you have the right to not answer my

2    questions, and that is true every time you are in court.

3            For those of you who have been arrested on a criminal

4    complaint, you have the right to have the government in next

5    couple of weeks go to a grand jury with evidence about your

6    case.

7            A grand jury is made up of citizens called to jury

8    duty.  They don't work for the government.  Instead, they kind

9    of look over the government's shoulder.  They hear the

10   government's evidence and decide if they agree with the

11   government that there is enough evidence to accuse you of a

12   crime.  We call that probable cause.  Did you probably commit a

13   crime.  If a grand jury makes that finding, it would accuse you

14   of a crime with a document called an indictment.

15           The grand jury doesn't decide if you are guilty or

16   not -- that is for trial later on -- just if it is OK to charge

17   you with a crime.  For some of you that might be coming up.

18           The government has the right under certain

19   circumstances to ask the court to order that a defendant stay

20   in jail until trial.  We call that pretrial detention.  The

21   government lawyer will tell me for each of you what the

22   government's position is about whether you get out on a bond or

23   not.

24           If the government asks that you be held in pretrial

25   detention, you will have a right to a detention hearing

1    sometime next week.  If the government agrees you should get

2    out on a bond but you all can't agree about the amount of bond

3    and the kind of bond, you have the right to a bond hearing.

4         Really the same thing happens at a detention or a bond

5    hearing, that is, the government's lawyer and your lawyer will

6    present evidence and argument to the judge, and once the judge

7    has heard from both sides the judge will decide if he or she

8    thinks you should be held without a bond until your trial or

9    whether you might get out on a bond.

10        If the judge decides to let you out on a bond, the

11   judge will decide the kind of bond, the amount of the bond, and

12   other special conditions that are attached to that.

13        If you are not a citizen of the United States, you

14   have the right to request a government lawyer or agent to

15   notify the consulate of the country where you hold citizenship

16   that you are here and you have been accused of a crime.

17        Would you raise your hand if any of you did not

18   understand any of the rights I have just described?  OK.

19        (Pause)

20        THE COURT:  Tsvia Kol, case No. 22 60242.

21        I have signed an order unsealing the indictment.

22        MS. COMOLLI:  Good afternoon, your Honor.  Alexandra

23   Comolli on behalf of the United States.

24        THE COURT:  OK.

25        MR. KREISS:  Good afternoon, your Honor.  Jason Kreiss

1  on behalf of Tsvia Kol, who is standing to my left.

2        THE COURT:  OK.  Are you entering a temporary right

3  now?

4        MR. KREISS:  I entered a temporary appearance this

5  afternoon, your Honor.

6        THE COURT:  All right.  Ms. Kol, did you understand

7  the legal rights that I explained at the beginning?  You will

8  want to speak into that microphone.

9        THE DEFENDANT:  Yes.

10        THE COURT:  You do.  OK.  Very good.

11        An indictment has been filed and it has three charges.

12        The first charge is that between August of 2020 and

13  November of 2020, in Broward County, that you conspired with

14  others to possess with intent to distribute at least 500 grams

15  or more of methamphetamine.

16        Then there are two charges that concern the date

17  November 12th of 2020.  They charge that on that date you

18  attempted to possess with intent to distribute that

19  methamphetamine and that you did possess with intent to

20  distribute methamphetamine.

21        So do you understand that that is a summary of the

22  charges filed against you?

23        THE DEFENDANT:  Yes.

24        THE COURT:  OK.  All right.  What is the government's

25  position about Ms. Kol's release?

```
 1              MS. COMOLLI:  Your Honor, this is a presumption case.
 2    We will be seeking detention.
 3              THE COURT:  OK.  So three days would be December 7th,
 4    Wednesday.
 5              Does that work for you, Mr. Kreiss?
 6              MR. KREISS:  I'm actually prepared to go forward this
 7    afternoon, if the court can accommodate a hearing.
 8              THE COURT:  Do you have an agent?
 9              MS. COMOLLI:  I do have an agent here, your Honor.
10              THE COURT:  Then what I'd like to do is take care of
11    the other cases and re-call you.
12              MR. KREISS:  Great.
13              THE COURT:  OK.
14              MS. COMOLLI:  Thank you, your Honor.
15              MR. KREISS:  Thank you.
16              THE COURT:  OK.
17              (Recess)
18              MS. COMOLLI:  Good afternoon again, your Honor.
19    Alexandra Comolli on behalf of the government.
20              THE COURT:  OK.  Could you spell your last name,
21    please.
22              MS. COMOLLI:  Yes, your Honor.  Comolli,
23    C-O-M-O-L-L-I.
24              THE COURT:  Alexandra?
25              MS. COMOLLI:  Yes.  Yes, Judge.
```

```
 1            THE COURT:  OK.  Defense counsel.  I'm sorry.

 2            MR. KREISS:  Good afternoon again, your Honor.  Jason

 3   Kreiss --

 4            THE COURT:  OK.

 5            MR. KREISS:  -- on behalf of Ms. Kol, who is standing

 6   to my left.

 7            THE COURT:  OK.  On what grounds is the government

 8   asking that Ms. Kol be detained?

 9            MS. COMOLLI:  Yes.  The government will be proceeding

10   on danger to the community and risk of flight.

11            THE COURT:  Is there a statutory presumption?

12            MS. COMOLLI:  There is, your Honor.

13            THE COURT:  OK.  I know it is late, but I still want

14   to catch every word you say, so please don't speak so fast.

15            MS. COMOLLI:  I am from the northeast, but I will do

16   my best to slow down.

17            THE COURT:  Yes, slow it down.  This is important

18   stuff.

19            MS. COMOLLI:  It is.

20            THE COURT:  OK.  So you can proffer the direct

21   testimony of your witness.

22            MS. COMOLLI:  Yes, your Honor.  May I start by saying

23   that at the time of the charged conduct, I'd like you to just

24   consider that FDC was limiting who could be held there and

25   there was a freeze on grand juries due to the COVID pandemic.
```

1   We were right in the height of it in November 2020.  So given

2   that situation and Ms. Kol's initial cooperative and extensive

3   drug connections, law enforcement decided to use her as an

4   informal cooperator without a formal written agreement.

5        Ms. Kol orally agreed to provide information on

6   shipments and coconspirators to law enforcement, and she also

7   agreed to stop engaging in illegal activity.

8        THE COURT:  I am not understanding what you are

9   saying.

10        MS. COMOLLI:  I apologize, your Honor.

11        THE COURT:  I did not have a chance yet to read the

12   Pretrial Services report, which I will do.

13        MS. COMOLLI:  I see.  OK.

14        THE COURT:  OK.  That would help.

15        MS. COMOLLI:  I can come back to that at the end to

16   provide that and I will just start with the conduct then.

17        THE COURT:  OK.

18        MS. COMOLLI:  OK.  So in early November 2020, law

19   enforcement seized a package in the Southern District of

20   Florida and conducted a dog sniff on that package.  This

21   resulted in a positive alert for drugs.  They then obtained a

22   search warrant for the package and inside found approximately

23   1,321 grams of 93 percent pure methamphetamine.

24        Afterwards, law enforcement attempted to do a

25   controlled delivery of the package, after replacing the meth

1   with sham drugs, and a courier came and picked up the package.

2   When that courier was approached by law enforcement, she told

3   officers that she was just a courier and confirmed that and

4   that she had also, she was supposed to meet with an Israeli

5   woman known as Sapir Kol, whom she had previously purchased

6   meth from in clubs.

7           She then called -- the courier --

8           THE COURT:  How is this a controlled delivery?

9           MS. COMOLLI:  Where law enforcement went with the

10  courier to meet with -- I apologize.  Controlled delivery, it

11  simply just means, your Honor --

12          THE COURT:  I know what a controlled delivery is.

13          MS. COMOLLI:  I'm sorry.

14          THE COURT:  This courier is someone who was meant to

15  get the package.

16          MS. COMOLLI:  Yes.

17          THE COURT:  How did that person -- was the package

18  addressed to that person?

19          MS. COMOLLI:  I don't recall if it was specifically

20  addressed for her, but I do know when it was held she did call

21  in asking about the package.

22          THE COURT:  OK.  So this person who is a courier

23  called to ask about this package, was expecting it --

24          MS. COMOLLI:  Yes, your Honor.

25          THE COURT:  -- somehow, and she was supposed to

1    deliver it somebody, and it turned out to be the defendant,

2    right?

3              MS. COMOLLI:  Yes.  That's correct.

4              THE COURT:  OK.

5              MS. COMOLLI:  Yes.  That's correct, your Honor.

6              THE COURT:  And the courier said the defendant has

7    sold me meth before?

8              MS. COMOLLI:  Yes, correct.

9              The courier then called the defendant and the

10   defendant then told her not to open the box and discussed

11   precisely where to meet in Hallandale Beach for the transfer,

12   where she would be picking up the box from her.

13             So law enforcement surveillance thereafter witnessed

14   the courier hand the package to the defendant, who then placed

15   the package with the sham meth on the driver's seat of her car.

16             After law enforcement arrested --

17             THE COURT:  Hold on.  Hold on.

18             MS. COMOLLI:  Yes.

19             THE COURT:  OK.

20             MS. COMOLLI:  OK.  After law enforcement arrested her,

21   Ms. Kol signed a written Miranda waiver and consent forms to

22   search her car, her phone, and her residence, as well as she

23   had stated to law enforcement that she had more drugs there.

24             THE COURT:  Car, home, and --

25             MS. COMOLLI:  Car, phone, and her residence.

```
 1              THE COURT:  -- and her phone.

 2              MS. COMOLLI:  Yes.

 3              THE COURT:  The car, the home, and the phone.

 4              MS. COMOLLI:  Yes.

 5              THE COURT:  She gave a consent to search.

 6              MS. COMOLLI:  All three, yes.

 7              THE COURT:  And she made statements, Ms. Kol made

 8      statements that --

 9              MS. COMOLLI:  There were drugs at her home.

10              During that interview, Ms. Kol admitted to knowing the

11      package contained 3 pounds of methamphetamine and gave

12      additional details about her involvement with drug traffickers

13      from Sinaloa, Mexico.

14              THE COURT:  I'm sorry.  Can you go more slowly.

15              MS. COMOLLI:  Of course, your Honor.  I'm so sorry.

16              THE COURT:  We do want to leave before the air

17      conditioning goes off and the marshals whatever, have to deal

18      with the situation, but I need to hear it.

19              MS. COMOLLI:  No, of course.

20              THE COURT:  So the defendant knew there was 3 pounds

21      of meth in the package and?

22              MS. COMOLLI:  And she also provided law enforcement

23      with additional details about her involvement with drug

24      traffickers from Sinaloa, Mexico.

25              THE COURT:  OK.
```

1          MS. COMOLLI:  They then proceeded directly to --

2     "they" being the law enforcement officers and the defendant --

3     proceeded directly to her residence, where law enforcement

4     found an additional 500 grams of methamphetamine and several

5     baggies, pipes, and scales out in the open throughout the

6     house.

7          THE COURT:  Who does she live there with?

8          MS. COMOLLI:  She lived there with her boyfriend.

9          THE COURT:  OK.

10          MS. COMOLLI:  She did ask -- she called ahead and

11     asked the boyfriend to leave the house before they got there so

12     that there was no incident.

13          Also in the house officers found dozens of fentanyl

14     pills, weighing approximately 58 grams, in an open safe inside

15     the single bedroom, as well as other drugs that were more

16     consistent with personal use, including several oxycodone

17     pills, a bag of mushrooms, and three MDMA pills scattered

18     throughout the apartment.

19          THE COURT:  OK.

20          MS. COMOLLI:  As I mentioned before, your Honor,

21     Ms. Kol agreed to an informal cooperation with law enforcement

22     where she --

23          THE COURT:  What do you mean "informal?"

24          MS. COMOLLI:  There was no written formal agreement

25     regarding her cooperation.

```
1              THE COURT:  OK.

2              MS. COMOLLI:  But she was told specifically to stop

3    engaging in illegal activity outside of her cooperation with

4    law enforcement.

5              THE COURT:  So they made a decision to not arrest her

6    at that time.

7              MS. COMOLLI:  Correct.  And again, that was based on

8    the pandemic at the time, given that grand juries were -- there

9    was a freeze on grand juries and FDC was limited.

10             THE COURT:  So that was the reason --

11             MS. COMOLLI:  Those were two of the reasons.  The

12   other reasons, your Honor, were her cooperation at the time,

13   and particularly her extensive, her extensive connections with

14   coconspirators.

15             THE COURT:  That cooperation might be productive.

16             MS. COMOLLI:  Yes.  Correct.

17             THE COURT:  So you're saying that law enforcement said

18   I think she might be able to really help us and --

19             MS. COMOLLI:  And what ended up happening, your Honor,

20   is that --

21             THE COURT:  -- if she was arrested there would be

22   delays on indictment and all of that.

23             MS. COMOLLI:  Yes.  Correct, your Honor.

24             So in July 2021, Ms. Kol met with law enforcement and

25   voluntarily admitted to picking up a package of methamphetamine
```

1    that weighed approximately 15 pounds and distributing it to

2    several coconspirators without law enforcement's approval,

3    which, again, was an original condition of their informal

4    agreement and something she acknowledged in that recorded

5    interview.

6            THE COURT:  So we go from November 2020 to July 2021.

7            MS. COMOLLI:  Yes, your Honor.

8            THE COURT:  Is she cooperating in between those times?

9            MS. COMOLLI:  I --

10           THE COURT:  Is she providing information?

11           MS. COMOLLI:  I'm not sure the full extent of her

12   cooperation, but I do believe that -- I have an agent here who

13   is able to speak to that.

14           THE COURT:  Just to orient me, the dates in the

15   indictment are all about the first package --

16           MS. COMOLLI:  Yes.

17           THE COURT:  -- the package she was arrested on.

18           MS. COMOLLI:  Yes.  They are all about that first

19   pickup and the methamphetamine in the residence, correct.

20           THE COURT:  You apparently decided you could not

21   charge her on what she said she did in July.

22           MS. COMOLLI:  Yes, we decided not to charge that.

23           THE COURT:  OK.

24           MS. COMOLLI:  That concludes our proffer at this time,

25   your Honor.

```
 1                 THE COURT:  OK.

 2                 Mr. Kreiss.

 3                 MR. KREISS:  I would like to inquire from the agent,

 4       if I may, your Honor.

 5                 THE COURT:  OK.

 6                 MR. KREISS:  If I can have just one moment, please,

 7       just to speak with Ms. Kol.

 8                 THE COURT:  Speak with Ms. Kol and let me read through

 9       the Pretrial Services report real quick, which, fortunately, is

10       not very long.

11                 (Pause)

12                 THE COURT:  And who is our witness?

13                 MS. COMOLLI:  Your Honor, the government tenders

14       United States Postal Inspection Service special agent Daniel

15       Borja.

16                 THE COURT:  OK.  Come on up.

17                 Sir, do you solemnly swear or affirm that the

18       testimony you give will be the entire truth?

19                 THE WITNESS:  I do.

20        DANIEL BORJA,

21            called as a witness by the Government,

22            having been duly sworn, testified as follows:

23                 THE COURT:  OK.  Have a seat.  Get close to the

24       microphone.  Tell us your name and spell your last name,

25       please.
```

 1          THE WITNESS:  My name is Daniel Borja.  Last name is

 2     B-O-R-J-A.

 3          THE COURT:  B-O-R-J-A, and you're a U.S. postal

 4     inspector, right?

 5          THE WITNESS:  Correct.

 6          THE COURT:  OK.

 7     CROSS-EXAMINATION

 8     BY MR. KREISS:

 9     Q    Good afternoon.

10          THE COURT:  You want to speak into that microphone.

11     Q    Good afternoon, or it might even be good evening, agent.

12     A    Good evening.

13     Q    So you're the case agent in this matter?

14     A    I'm the co-case agent.  I represent the United States

15     Postal Inspection Service.  The other co-case agent is Matt

16     Green with the DEA.

17     Q    OK.  Great.  And you heard the government's proffer,

18     correct?

19     A    Correct.

20     Q    And do you have any additions or deletions or would you

21     modify it in any way?

22     A    No.

23     Q    OK.  So you would accept that as true?

24     A    Yes.

25     Q    OK.  The government had indicated that a package was

Borja - Cross

1    intercepted.

2    A    Correct.

3    Q    Is that a U.S. Postal or through one of the private

4    carriers?

5    A    Postal.

6    Q    OK.  Was there intel provided regarding the package or was

7    it a random drug sniff?  How did that interception happen?

8    A    Random.  I search postal databases from source cities, like

9    LA, where this parcel came from, coming into our area and we

10   just profile them randomly.

11   Q    So you search databases and you can see where the packages

12   are coming from?

13   A    Correct.

14   Q    And what about this package indicated to you that?

15   A    Source city.  LA is a source city for methamphetamines.  We

16   get hundreds of kilos of meth and fentanyl from LA during the

17   months, years, countless numbers of parcels with drugs.

18   Q    Understood.  I would assume we get hundreds, thousands,

19   maybe hundreds of thousands of packages yearly from Los

20   Angeles.  What made this particular package stand out?

21   A    Like I said, the source city, the weight.  It was sent

22   overnight.  Drug dealers like to use overnight express mail to

23   make sure the product gets there the very next day.  It is a

24   preferred method of mailing drugs.

25   Q    Anything else that made this particular package stand out

1   to you?

2   A   No.

3   Q   So what actually happens at that point?  Do you get a bar

4   code and you are alerted when the package gets to you?

5   A   So I will stop the parcel.  I will get it.  I look up the

6   address to see if they got previous parcels.  Then I will get a

7   dog to hit on it, narcotics dog.  In this case the dog hit on

8   this parcel.

9   Q   So were there any other indications besides the package

10  coming from Los Angeles, the weight, and the fact that it was

11  overnight that indicated to you that it might contain

12  narcotics?

13  A   No.

14  Q   OK.  And the dog that was utilized, was that a Postal dog,

15  DEA dog?

16  A   It was DEA/TFO dog.  We don't have dogs.  Postal doesn't

17  have dogs.

18  Q   OK.  Whose dog was it?

19          THE COURT:  Is this really important, whose dog it

20  was?

21          MR. KREISS:  Well, we started with a random parcel

22  getting searched.

23          THE COURT:  Right.

24          MR. KREISS:  It appears it is not so random.  There is

25  a package that was --

Borja - Cross

1          THE COURT:  Right.  It is a dog, a dog that alerted.

2     So I think we need to move on.

3          MR. KREISS:  OK.

4     BY MR. KREISS:

5     Q    So the dog alerts to the package.  What happens at that

6     point?

7     A    We apply for a search warrant.  We get a search warrant.

8     We open it up, execute the search warrant, find out it contains

9     about 1.5 kilos of methamphetamine, and then we plan for a

10    controlled delivery.

11    Q    Was it a state or federal search warrant?

12    A    Federal.

13    Q    And at that point had you done any investigation to

14    determine the source at that point?

15    A    The source of where it came from?

16    Q    Correct.

17    A    Right now we are focused, at that point we were focused on

18    the recipient, and based on Postal databases the recipient

19    actually called in for that parcel.  So they were very

20    interested in the whereabouts of where it was.  As far as the

21    other source, no.

22    Q    So at that point it's packaged up, narcotics are put back

23    in, and there is a delivery to this other source, correct?

24    A    Correct.

25    Q    The recipient?

1   A    Correct.

2   Q    Once you deliver the package to the recipient, you had

3   indicated the recipient said that Ms. Kol had sold her

4   narcotics before?

5   A    Correct.

6   Q    Particularly, you said methamphetamine.

7   A    Correct.

8   Q    Do you have any -- first of all, was that statement

9   recorded?

10   A    I can't recall.

11   Q    OK.  Was that person arrested, the recipient?

12   A    No, she was not arrested.

13   Q    Why not?

14   A    For the same reason Kol wasn't arrested, because during

15   COVID times FDC had, really didn't want to take anybody unless

16   they were a high-profile criminal.  And also, we also used her

17   to cooperate to find Kol.

18   Q    OK.  Going back to what you just said, FDC didn't want to

19   take people unless they were high-profile criminals.  That's

20   what you just said?

21   A    Correct.

22   Q    During that period of time, during COVID, and obviously

23   COVID kind of waned and there were times when it was more

24   serious, less serious, you made arrests and people were placed

25   into FDC, correct, that you believed were a danger to the

Borja - Cross

 1   community?

 2   A   During that time?

 3   Q   Correct.

 4   A   I really can't recall.  I think that was my first -- I

 5   don't know.

 6   Q   OK.

 7   A   I made very few arrests that year.

 8   Q   But you're aware of other agents making arrests and having

 9   people placed in FDC during that period of time, albeit less

10   than the norm, correct?

11   A   I don't recall.  I just remember --

12            THE COURT:  You know what, I got your point.  Some

13   people got arrested.  I think we should move on.

14   BY MR. KREISS:

15   Q   And that person, the recipient, still has not been

16   arrested, correct?

17   A   Correct.

18            THE COURT:  The recipient?

19            MR. KREISS:  The recipient, the original recipient of

20   the package.

21            THE COURT:  I thought the recipient is your client,

22   Ms. Kol.  It was being delivered to her.

23            MR. KREISS:  No, your Honor.

24            THE COURT:  Did I misunderstand something?

25            MS. COMOLLI:  I believe when he says recipient, he is

1    referring to the original courier, the person who picked up the

2    package at the post office, who then brought the package to

3    Ms. Kol.

4              THE COURT:  So the package was addressed to the

5    courier?

6              THE WITNESS:  Correct.

7              THE COURT:  The package was addressed to the courier.

8              THE WITNESS:  Correct.

9              THE COURT:  And the courier came and said my job is

10   just to give this to Ms. Kol.

11             THE WITNESS:  Correct.

12             THE COURT:  And you didn't develop a case sufficient

13   to arrest the courier, I take it.

14             THE WITNESS:  Correct.

15             THE COURT:  OK.  But you did develop a case,

16   obviously, as to Ms. Kol.  She gave consent.  You found all the

17   drugs.  She said she knew what was in the package, etc., right?

18             THE WITNESS:  Correct.

19             THE COURT:  OK.  I understand.  I don't know why it

20   matters what is happening with the courier.  I'm really focused

21   on Ms. Kol.

22             MR. KREISS:  I will move on, your Honor.

23             THE COURT:  It was delivered to her and she made

24   admissions that -- didn't she make an admission that she knew

25   there was about 3 pounds of methamphetamine in the package?

Borja – Cross

1            MR. KREISS:  According to the --

2            THE COURT:  That is my evidence.

3            MR. KREISS:  -- the government's proffer.

4            THE COURT:  Right.  OK.  I can only deal with what you

5    are proffering.  So OK.

6            Then she knew about -- she had had prior dealings with

7    this Sinaloa cartel, Mexican cartel with drugs, and went to her

8    home and then there was the 500 grams of meth and the baggies

9    and the pills and the open safe and all that.  There is a case

10   against Ms. Kol.

11           MR. KREISS:  Absolutely.

12           THE COURT:  I don't know why it matters what happened

13   to the courier --

14           MR. KREISS:  Well, I think it's --

15           THE COURT:  -- for what I'm trying to decide.

16           MR. KREISS:  Sure.  But I think it is relevant and it

17   goes to the weight of the evidence.  There is obviously a

18   relationship and there was a transaction between the original

19   recipient, who was called the courier, I'm calling the

20   recipient, who then provided it to Ms. Kol.

21           I was going to ask if that person is cooperating at

22   this time and is that the reason they weren't arrested.

23           THE COURT:  OK.

24           THE WITNESS:  We haven't spoken to her since.

25           THE COURT:  OK.

```
 1  BY MR. KREISS:

 2  Q   Do you know her whereabouts?

 3  A   No.

 4  Q   OK.

 5          THE COURT:  OK.

 6  BY MR. KREISS:

 7  Q   Is there a warrant for her arrest?

 8  A   No.

 9          THE COURT:  It doesn't really matter to me, to be

10  perfectly honest.  I don't know what I'm missing.  I'm trying

11  to figure out what is happening to Ms. Kol.

12          MR. KREISS:  Understood.

13  BY MR. KREISS:

14  Q   So ultimately the package is delivered to Ms. Kol and she's

15  cooperative with you, correct?

16  A   Yes.

17  Q   And she provided access to her telephone, her cell phone?

18  A   Yes.

19  Q   You were able to -- did you do like a Cellebrite

20  extraction?

21  A   It was -- we downloaded information.

22  Q   I'm sorry?

23  A   Matt Green, DEA, he downloaded information from her phone.

24  Q   And the government uses the word she was cooperative,

25  correct?
```

1    A    Yes.

2    Q    And she provided you with intel of people she knew,

3    sources?

4    A    Yes.

5    Q    She provided you with information as to what she was doing?

6    A    Yes.

7    Q    So the original package is received at the Postal Service

8    on what date, do you recall?

9    A    I don't recall.

10   Q    The day that -- so it's probably maybe a day or so after?

11   A    Day or so after?

12   Q    The indictment is a conspiracy from August 2020 to November

13   2020.  I'm trying to figure out the time frame when the package

14   is delivered to the Postal Service.

15   A    It would be a few days.  It would take a day to run the

16   dog, get the warrant, execute the warrant, get the ops plan

17   going.  So a few days after it was delivered.

18   Q    OK.  So would it be fair to say maybe the beginning of

19   November?

20   A    OK.  Correct.

21   Q    Does that make sense?

22   A    Yes.  You said August, though.

23   Q    Well, that's the --

24   A    OK.

25   Q    The indictment talks and provides a date of August 2020, in

Borja - Cross

1   and around, from in and around August 2020 through November

2   2020.

3   A   OK.  So it's November.

4   Q   OK.  So in November she starts -- she, Ms. Kol -- starts

5   providing you with intel, correct, and that is why you don't

6   arrest her?

7   A   Correct.

8   Q   And at that point in time you entered her apartment, her

9   condo.  Would it be fair to say it was obvious that she was a

10  user of methamphetamine?

11  A   100 percent obvious.

12  Q   You knew she had a drug problem?

13  A   Yes.

14  Q   You knew that she was an Israeli national?

15  A   Correct.

16  Q   OK.  And you chose not to make an arrest at that point in

17  time?

18  A   Correct.

19  Q   She cooperates, and the government had mentioned a date in

20  July 2020 she comes forward and tells you, hey, I was involved

21  in this deal, correct?

22  A   I believe it was July 2021.

23  Q   I'm sorry.  July 2021.

24  A   Right.  Correct.

25  Q   OK.  So from November 2020 through July 2021 Ms. Kol is in

Borja - Cross

1    the community.  You're aware of that, correct?

2    A    Yes.

3    Q    The concern about her danger or flight risk does not rise

4    to the level of needing to arrest her at that point, correct?

5    A    Correct.

6    Q    She's providing intel to you?

7    A    Bad intel, but correct.

8    Q    OK.  Did you say bad intel?

9    A    Bad intel.

10   Q    It didn't pan out?

11   A    It didn't pan out.

12   Q    She attempted to provide cooperation, correct?

13   A    Attempt is a good word.

14   Q    OK.  Through that entire period of time do you stay in

15   contact with her or do you assign someone else to?

16   A    Someone else stayed in contact.  The co-case agent, DEA

17   agent Matt Green, stayed in contact with her.

18   Q    And then in July 2021 an issue comes up.  You were working

19   to do a deal with her at that period of time, correct?

20   A    Correct.

21   Q    And you were aware of the deal that is ultimately

22   consummated, you were aware of it before it happened, correct?

23   You had been talking with her, planning to do it, correct?

24   A    Correct.

25   Q    And there was a problem with resources at that period of

Borja - Cross

1  time, correct?  Personnel, finances at that period of time.

2  A   No.  Not that I can recall.  We had lots of people on that

3  case.

4  Q   When Ms. Kol was ready to consummate the deal, law

5  enforcement was not, correct?

6  A   It wasn't on Ms. Kol's terms.  It was on the government's

7  terms.  So --

8  Q   When Ms. Kol was ready to do the deal with the people you

9  knew she was doing the deal with, the government wasn't ready

10 to consummate the deal, correct?

11 A   I don't recall that.

12 Q   OK.  I understand what you are saying, that it's your

13 belief, position that she should be operating according to your

14 direction and other law enforcement direction, but you were

15 aware that she was involved in setting up a deal at that period

16 of time, correct?

17 A   Correct.

18 Q   OK.  And ultimately the government wasn't able to move

19 forward, for whatever reason.  And I don't know.  I'm getting

20 involved in this case today.

21 A   Ultimately she did the deal on her own, she lied to us, and

22 we were out of it.

23          THE COURT:  This is the July 2021?

24          MR. KREISS:  Correct, your Honor.

25          THE WITNESS:  Correct.

Borja - Cross

1          THE COURT:  And you knew it was happening?

2          THE WITNESS:  We were preparing for the deal and she

3   did it on her own --

4          THE COURT:  I see.

5          THE WITNESS:  -- without telling us.

6          THE COURT:  I see.

7   BY MR. KREISS:

8   Q   And ultimately she told you that the deal was consummated,

9   correct?

10  A   Correct.

11  Q   OK.  And at that period of time you didn't arrest her?

12  A   No.

13  Q   You didn't believe she was a great enough flight risk that

14  you needed to arrest her, correct?

15  A   Correct.

16  Q   You did not believe she was a danger to the community at

17  that point where you needed to arrest her, correct?

18  A   I want to say she is not a danger to the community, but we

19  couldn't arrest her at that time.

20  Q   You had probable cause -- you had a package delivered to

21  her, you searched her house, you had her phone.  You had

22  probable cause to make an arrest, correct?

23  A   Correct.

24  Q   Again, at that point in time you didn't have -- it wasn't

25  necessary for the safety of the community or to secure her

Borja – Cross

1  appearance in court, correct?

2  A   Correct.

3  Q   OK.  When you went to Ms. Kol's house, you didn't seize any

4  significant currency, correct?

5          MS. COMOLLI:  I'm sorry.  Objection before on that

6  last one.  It called for speculation on his answer about why

7  she wasn't arrested.

8          THE COURT:  I don't remember.

9          MR. KREISS:  It doesn't call for speculation, but --

10          THE COURT:  What was the answer?

11          MR. KREISS:  No.  I had asked if the danger of flight

12  and danger to the community --

13          THE COURT:  OK.  I understand.

14          MR. KREISS:  -- he said no.  It is not speculation.

15          THE COURT:  Right.  It is whatever his testimony is.

16  Whatever he knows.  That's fine.

17  BY MR. KREISS:

18  Q   When you went to her house, she didn't have any currency

19  that you seized, correct?

20  A   No currency, but there was a money counter, and she did

21  speak of high amounts of cash that she would have at certain

22  amounts of time.

23  Q   OK.  She was essentially a middle person, correct?

24  A   I wouldn't say a middle person because she received large

25  quantities of kilos of methamphetamine.  She admitted to -- I

Borja - Cross

1  can't give you an exact number, and I would have to look back

2  at my paperwork, but at least, including the deal, at least 30

3  kilos.

4            THE COURT:  I'm sorry.  You're saying that she

5  acknowledged to at least 30 kilos of methamphetamine?

6            THE WITNESS:  Right.  Right.

7            THE COURT:  That she was involved in trafficking?

8            THE WITNESS:  Correct.

9  BY MR. KREISS:

10  Q   You don't have any evidence that supports that other than

11  what you are saying here today, correct?

12  A   The only evidence is the 100 percent concrete evidence that

13  we have right now at this point is the 1.3 and the 500 grams we

14  took, but she also admitted to taking, to receiving, on the day

15  of the interview -- I would have look at it -- at least 10 more

16  kilos of methamphetamines, and in the deal that she lied to us

17  about was 15 pounds, I believe.

18  Q   The one that was done for the purpose of cooperation,

19  correct?

20  A   Correct, that she lied to us about.

21  Q   OK.  Again, you didn't seize any currency, correct?

22  A   No.

23  Q   Didn't seize any bank accounts?

24  A   No.

25  Q   Didn't seize any cars?

Borja - Cross

1   A   No.

2   Q   Didn't seize any other assets that would be consistent with

3   someone who is a high-level drug trafficker, correct?

4   A   Correct.

5   Q   And you, again, for two years, have been investigating this

6   case?

7        THE COURT:  I got that point.

8   Q   Correct?

9   A   Correct.

10       THE COURT:  I got that.

11  BY MR. KREISS:

12  Q   It was Matt Green that arrested her most recently, correct,

13  to bring her here?

14  A   Correct, and I was there as well.

15  Q   OK.  And Ms. Kol was cooperative?

16  A   Yes.

17  Q   OK.  I spoke with Matt Green earlier.  He indicated she

18  didn't give you any trouble at all during her arrest?

19  A   No.

20  Q   Didn't try to run or hide from you or evade you in any way?

21  A   No.

22  Q   When you arrested her again, you again didn't seize any

23  weapons, currency, assets of anything, of any nature that would

24  be significant with a drug trafficker, correct?

25  A   Correct.

Borja - Cross

1   Q   OK.  And you're aware -- I'm assuming that she lives in a

2   condo that's owned by her mother, who is present in court?

3   A   Correct.

4   Q   And during this period of time, the approximate two years

5   you have been investigating the case, you or someone else, I'm

6   assuming, kept a pretty close eye on her, correct?

7   A   On and off.

8   Q   OK.  If there were any signs that she was going to flee or

9   further endanger the community, she would have been arrested,

10  correct?

11  A   Correct.

12  Q   OK.  And at this point in time today, when she is arrested

13  here, there is nothing in addition to what we've spoken about

14  that caused her arrest except it was time to present the case.

15  It had passed from one prosecutor to another prosecutor and it

16  was time to file, correct?

17  A   Correct.

18          THE COURT:  Hold on just one second.

19          (Pause)

20          THE COURT:  OK.  Thanks.  Because of the construction

21  in this building there are days in which by 6 p.m. everything

22  is off to save our data, but we need to record this, and to

23  record this requires to have devices up.  I want to finish this

24  because I think we are close to finishing.

25          MR. KREISS:  We are very close, your Honor.

1          THE COURT:  We are.

2          (Pause)

3          THE COURT:  OK.  Anything else?

4          MR. KREISS:  I'm sorry, your Honor.  No further

5   questions.

6          THE COURT:  OK.  Any redirect?

7          MS. COMOLLI:  Yes, your Honor, just briefly.

8   REDIRECT EXAMINATION

9   BY MS. COMOLLI:

10  Q   Agent Borja, did law enforcement provide approval to pick

11  up, to Ms. Kol to pick up the 15 pounds of meth that day?

12  A   Did we provide approval?

13  Q   Provide approval.

14  A   No, no.

15  Q   No.  OK.

16         THE COURT:  I got that.  She did that without --

17         MS. COMOLLI:  No further questions, your Honor.

18         THE COURT:  Right.

19         I have a question for you, sir.  After July of 2021

20  when Ms. Kol admitted that she went out on her own without

21  working with law enforcement on this 15-pound delivery, what

22  happened between July of 2021 and her indictment in November of

23  2022?

24         THE WITNESS:  Your Honor, to my understanding there

25  was just a problem with getting prosecution for whatever

1    reason.

2         THE COURT:  So you did not, law enforcement did not

3    work with her anymore.

4         THE WITNESS:  No.  After that we completely shut off

5    communications.

6         THE COURT:  I see.  OK.

7         Do you happen to know if Israel has an extradition

8    treaty with the U.S.?

9         THE WITNESS:  I do not know, your Honor.

10        MS. COMOLLI:  Your Honor, I can speak to that.

11        THE COURT:  There is a treaty but there is a

12   limitation on Israeli citizens.

13        MS. COMOLLI:  Yes, that is correct, your Honor.  They

14   do not extradite their own citizens, especially for drug

15   crimes.

16        THE COURT:  OK.

17        (Pause)

18        THE COURT:  OK.  Is there any other government

19   evidence?

20        MS. COMOLLI:  Evidence, no, your Honor.  Just

21   argument.

22        THE COURT:  OK.  Is there defense evidence?

23        MR. KREISS:  No evidence, your Honor.

24        THE COURT:  Let me talk to the government first.  What

25   are the advisory sentencing guidelines?

1    MS. COMOLLI:  Yes, your Honor.  So even with safety

2    valve eligibility she is still facing an incredibly high

3    sentence.  The guideline sentence here, with a Criminal History

4    Category of I and a 38 adjusted offense level, is 235 months to

5    293 months.  I will add with acceptance and the safety valve,

6    that drops to still very high.  135 to 168.

7    THE COURT:  OK.  All right.  The rest of your

8    argument.

9    MS. COMOLLI:  Yes, your Honor.  So as I mentioned

10   before, this is a presumption case.  This is a very strong case

11   that we have here.  The defendant confessed to this and, as I

12   mentioned, she is facing a very high sentence even with

13   acceptance and the safety valve.  We are talking about over

14   1800 grams of meth.  Over 4 pounds.  That is a street value of

15   anywhere from 12 to almost 17,000 dollars.

16   THE COURT:  As you put together the 1.3 kilograms with

17   the 500 kilograms found in her home --

18   MS. COMOLLI:  It was 1,321 grams and the 500 in her

19   home, yes.

20   THE COURT:  And that gets you to -- that is the amount

21   of drugs that you're talking about.

22   MS. COMOLLI:  Yes, to 1800.

23   THE COURT:  OK.

24   MS. COMOLLI:  Over 1800.

25   THE COURT:  That is no creative math then because

1   those are drugs actually in her possession.

2          MS. COMOLLI:  Yes.

3          THE COURT:  I understand your reasoning on that and it

4   makes sense to me.  OK.

5          MS. COMOLLI:  But even more important than the

6   presumption, your Honor, I would also just like to emphasize

7   that they found dozens of fentanyl pills in her apartment,

8   weighing over 58 grams.  As your Honor I am sure is aware, that

9   is the most deadly drug there is out there, and the opioid

10  epidemic has wrought a terrible toll on not only our country

11  but our community here in South Florida.

12         THE COURT:  I got that.  It is bad.

13         MS. COMOLLI:  Yes.  With that, your Honor, I think

14  also I would like to point out that she is a legal permanent

15  resident, originally from Israel.  That is where she grew up.

16  She's traveled there --

17         THE COURT:  Do you have any idea how much she's

18  traveled there?

19         MS. COMOLLI:  I know the most recent travel she had

20  there was 2019, which was right before the pandemic started,

21  and that she had international travel at least once a year

22  since 2012.

23         As I mentioned, your Honor -- sorry.  As you pointed

24  out, your Honor, Israel doesn't extradite, and so --

25         THE COURT:  Its own citizens.

1    MS. COMOLLI:  Its own citizens, correct.

2    THE COURT:  What I don't know is what it would --

3    that's right, she is not a citizen here.  She is a permanent

4    resident.

5    MS. COMOLLI:  She is a legal permanent resident.

6    THE COURT:  Right.

7    MS. COMOLLI:  So actually, as I'm sure you're aware,

8    what that means is that she will be deported upon conviction,

9    and there is really no discretion on that.

10    So given the strength of the case against her and her

11    deportation upon conviction, why wouldn't she just take off,

12    especially -- I know she mentioned she has a father in Israel.

13    While she claims limited contact with him, she not only has the

14    father but two half siblings there.  Her family here, as I

15    understand it, are also Israeli citizens and could very well go

16    join her there if they so choose.

17    I think also, your Honor, I would say she has $560 in

18    a bank account.  She's been unemployed for a year.  The

19    connections here are really just through the family, who are

20    also able to leave the country as they please.

21    Then I would also just proffer, your Honor, or argue,

22    your Honor, that the fact that she agreed to cooperate with the

23    government and then couldn't follow the rules demonstrates an

24    inability to follow rules there and it casts a questionable

25    shadow over whether or not she can comply with the conditions

1   of bond.  Again, there that she admitted to when she did not

2   follow the rules there, that was 12 pounds of meth.  That's

3   5,443 grams, approximately.  That's a lot of meth, if I may

4   say.

5           So in viewing through, as you mentioned, sort of the

6   little narrow blinders of bond here, we feel that we have a

7   very strong case for detention here based on both danger to the

8   community and risk of flight.

9           THE COURT:  OK.  So, Mr. Kreisser -- am I saying your

10  name right?

11          MR. KREISS:  Kreiss.

12          THE COURT:  Kreiss.  Sorry about that.

13          MR. KREISS:  The first issue, your Honor, I think the

14  guidelines are actually significantly less.  We are talking

15  about 1.8 or so kilos, correct?

16          MS. COMOLLI:  No, it is not kilos.  It is grams.

17          MR. KREISS:  Well, you have 1800 grams, correct?

18          MS. COMOLLI:  Sorry.  I apologize.  Meth is not my

19  strong suit.  That is why I became a lawyer.

20          THE COURT:  It is a little under 2 kilograms of

21  methamphetamine, right?

22          MR. KREISS:  Correct.  That would give us a base of

23  32.  It is charged as methamphetamine.  1.5 kilos to 5 kilos is

24  a base of 32, less 2 for safety valve, with an additional

25  reduction of 3 for acceptance of responsibility.

MS. COMOLLI: Sorry. I apologize. That is with a specific offense characteristic, maintaining a premises for distribution, which adds the 2-level increase. I apologize.

THE COURT: That is her reasoning.

MS. COMOLLI: Yes.

THE COURT: OK.

MR. KREISS: So we would be two levels high. We still wouldn't be at 200 some odd --

THE COURT: What do you think you would be at?

MR. KREISS: Well, my calculations, and it remains to be seen whether or not the premise would be proven, would be 70 to 87 months.

THE COURT: OK.

MR. KREISS: Which is a third of what the government had proffered.

Two levels higher would be, I am going to say --

THE COURT: It would be about half of the 135 to --

(Pause)

MR. KREISS: I can look it up.

THE COURT: OK.

MR. KREISS: Maybe 87. Less than 100 months. I don't think that is an insignificant amount of time. That is a tremendous --

THE COURT: It is not. It is not.

MR. KREISS: That is a tremendous amount of time for

1    someone who's never been in trouble.

2              THE COURT:  It is more than five years.

3              MR. KREISS:  Correct.

4              THE COURT:  Right.

5              MR. KREISS:  Absolutely.

6              MS. COMOLLI:  Again, I would like to point out the

7    statutory minimum here is ten years for what's charged.

8              THE COURT:  OK.  Let's let Mr. Kreiss finish.

9              MS. COMOLLI:  Yes, your Honor.

10              MR. KREISS:  Again, she would not be -- on a plea, she

11    would receive significantly less.

12              Anyway, I think the court is going to be concerned

13    certainly about Ms. Kol's nationality.  She is a permanent

14    resident.  Her criminal history is a prior petty theft.  She

15    has been a resident of this community for almost 20 years.  Her

16    mother is present in court.  She's been here -- I can have her

17    stand up.

18              THE COURT:  I see her back there.

19              I see you there.  Thank you for coming.

20              MR. KREISS:  Her name is Sigly Yepes, Y-E-P-E-S.  I

21    talked to her about foreseeing the court's concern.  Her mom is

22    a United States citizen, but Israeli citizens have dual

23    passports.  So she has a U.S. and Israeli passport.  She would

24    be willing to turn in her passport, surrender her passport as

25    part of a bond package, which I know the government had made

1  mention of the concern that she could go back to Israel, her

2  family would go with her.

3       Her uncle is also here.  His name is Avi, last name

4  G-O-L-D-S-M-I-T.  He is also willing to surrender his documents

5  and also cosign on a bond for her.

6       Both her mom and uncle are United States citizens.

7  They are in the cell phone accessory business.  They have

8  retail establishments in a mall.  They sell all kinds of

9  accessories.

10      Her mom has a condo that she owns free and clear.

11  That is the residence that Ms. Kol lives in.  That is located

12  at 270 L-A-Y-N-E Boulevard, Hallandale Beach.  That residence

13  is owned by her mom free and clear.  Ms. Kol lives at that

14  residence.  The value, I looked online, is approximately

15  $125,000.

16      Her uncle also has a residence that is owned free and

17  clear located at 4805 Southwest 32nd Terrace, Fort Lauderdale.

18  He purchased it about ten years ago.  I looked online.  I think

19  a conservative value is $275,000.

20      THE COURT:  With no mortgage.

21      MR. KREISS:  With no mortgage as well.

22      It is obvious, your Honor, that government, law

23  enforcement at the time did not feel that Ms. Kol was a danger

24  to the community or a significant flight risk.  For two years

25  they have been, surveilling may not be the right word, but

1  keeping tabs on her.  They knew she was an Israeli national.

2  They knew her ties to Israel, they knew her ties here, and they

3  felt comfortable keeping her.

4          There was an issue, and I don't think we have seen the

5  end of what that attempted cooperation was.  I'm going to

6  investigate it.  Again, I'm here today for the first time

7  learning about all of this, but this was an attempted

8  cooperation.  It went bad.  Again, law enforcement chose not to

9  arrest her.  They knew her ties.  They knew the issue she had.

10  Again we are here two years -- we are here a year later and

11  still there wasn't an arrest made.

12          I practiced through COVID.  I know the court did.  We

13  had lots of challenges, but people who were a danger to the

14  community were arrested.

15          I think at this point in time I don't think the

16  government has met their burden in this case.  I think it is

17  clear the actions --

18          THE COURT:  What bond do you suggest?

19          MR. KREISS:  So I was going to ask the court to

20  consider a $100,000 10 percent bond, cosigned by both her mom

21  and her uncle, with a condition that neither of them encumber

22  their properties, with an additional personal surety bond of

23  $200,000, which, again, they have the property to support in

24  the event that she would violate her bond.  Both of them would

25  surrender their passports.

1          I have talked to Ms. Kol.  I think an appropriate

2     condition of bond would be a substance abuse evaluation and any

3     treatment.  I don't think a curfew is out of line in this case

4     to give the court a comfort level in order to secure her

5     appearance and avoid any danger to the community.

6          THE COURT:  OK.  So, Ms. Kol, I agree with -- first of

7     all, you have done a heck of a job, Mr. Kreiss, for just

8     showing up today and getting your arms around this.  So I give

9     you a lot of credit.  You have got a good lawyer here working

10    for you.

11         I agree with Mr. Kreiss on danger to the community,

12    but I don't agree with you on risk of flight.  That is my

13    concern.  The argument that you have stressed, which is very

14    true, is that for certainly from July of '21, when Ms. Kol made

15    clear that she couldn't keep her promise to cooperate with the

16    government, from July of '21, 2021 until November 8th, whatever

17    happened at the U.S. Attorney's Office, they weren't indicting

18    the case.

19         Look, it is a danger to be dealing in methamphetamine

20    or fentanyl or in any of that, and it does sound like Ms. Kol

21    has a terrible dependency on methamphetamine.  That is the

22    impression I have.  But, and if I'm correct -- and, Ms. Kol, I

23    am speaking to your parents here, to your mother and your

24    uncle, who I appreciate are here, and your family.  It is very

25    much in your favor.

1          My best understanding is that you have a terrible

2    dependency on methamphetamine, which really impairs judgment

3    and people can be involved in a lot of wishful thinking, and

4    you weren't arrested all this time and I can imagine you may

5    have been hoping this whole thing would just blow over, but

6    here you are.  I think it is a different situation now.  You

7    have been arrested.

8          Let's take your attorney's, this kind of

9    back-of-the-envelope calculations of the guidelines.

10         MS. COMOLLI:  Your Honor, I actually did look it up

11   just quickly to make sure that we're correct here.  It is under

12   2D1.1(a)(5), and in looking to the drug quantity table, the

13   base is 36, for at least 1.5 kilograms but less than 4.5

14   kilograms --

15         THE COURT:  OK.

16         MS. COMOLLI:  -- of methamphetamine.

17         THE COURT:  At this point I am not going to continue

18   with that because let me take --

19         MS. COMOLLI:  Just for the record.

20         THE COURT:  -- your attorney's best, most favorable

21   guess for you on the guidelines, which is a very quick one.

22   That is putting you, assuming you are convicted -- and frankly,

23   the weight of the evidence against you is extremely high.  I

24   don't see a real defense for you.  I mean, you have got a good

25   attorney and he can work on it, but best-case scenario you're

1    looking at guidelines --

2              MR. KREISS:  Judge, I apologize for interrupting.  Is

3    it possible to get a bit of water?  Ms. Kol is feeling faint.

4              THE COURT:  Yes.  Why not pull up a chair.  Why not

5    pull up a chair for her.  OK.

6              (Pause)

7              THE COURT:  OK.  So my reasoning is that at this point

8    the odds are very high, and I think Ms. Kol would understand

9    it, that she will be convicted and that she will be sentenced

10   to a period of incarceration of a number of years, and that

11   allows for the possibility of acceptance and maybe some

12   downward departure, but it still would be measured in years.

13             MR. KREISS:  Absolutely.

14             THE COURT:  So I think where Ms. Kol's thinking might

15   be today would be very, very different than where it was for

16   that period of time that she was known to law enforcement but

17   at liberty.

18             I do appreciate the fact that -- you beat me to it.  I

19   was thinking about it.  Thinking about, well, family could

20   surrender passports also.  OK.  They surrender their passports.

21   If Ms. Kol makes her way to Israel, which I do think is

22   something that can be done even without a passport.  I am not

23   going to lay out how I think somebody can do it, but I think it

24   is doable.  She would be there.  Her parents would be here.

25   OK.  They still have their -- they are still here.  They are

1    not going to lose their citizenship because their daughter

2    left.  Then she is an Israeli citizen, and that has been my

3    understanding, that Israel will not extradite its own citizens.

4        So there is a path there for someone who has the

5    extremely poor judgment that goes along with a dependency on

6    methamphetamine to get herself out of here.

7        I see you want to say something so I'm stopping.

8        MR. KREISS:  I think, and I agree with the court, but

9    I think seeing you, seeing that seal, seeing those flags is a

10   reality check.  Being in her situation, cooperating with DEA --

11       THE COURT:  They are not cooperating with her anymore.

12       MR. KREISS:  Correct, but what I'm saying is she knew

13   the gravity of her problem all along and knew about it all of

14   this time.  May she have been hoping it would go away?  I would

15   be.  But she knew the gravity.

16       I think the court again could tailor a bond that is,

17   where you are able to secure her appearance.  I haven't done

18   the research on the extradition, and I have no reason to

19   believe what the government says isn't true.  I would talk to

20   her, but I would offer to the court that she would sign any

21   type of document waiving any extradition protections that would

22   be afforded by Israel.

23       Again, the properties being posted here, it is not

24   like the government came in and she had a lavish home and

25   assets and they marshaled those assets for her bond.  This is

1   her mom's property.  This is her uncle's property.

2           THE COURT:  But that is just a promise to not encumber

3   it.  The only way that property will quickly be gone is if you

4   put a corporate surety bond with a bondsman.  For somebody who

5   might be trying to leave the country, I think we are talking

6   about a bondsman.  Suddenly your expenses are going way up.

7           MR. KREISS:  Understood.

8           THE COURT:  So the simple promise to not encumber, and

9   I don't mean to be disrespectful to you, Ms. Kol, because all I

10  know is what I have heard here today, but with your lack of

11  judgment and your dependency on methamphetamine, I don't think

12  it is a quick fix for you to go into treatment and suddenly

13  start operating with good judgment.  I don't see this as -- I

14  am not feeling confident that a promise to not encumber

15  property is a sufficient motivation for a young woman who has

16  not been in jail before, right, or I don't think so.

17          MS. COMOLLI:  That's correct, your Honor.

18          THE COURT:  Maybe she spent a night in jail.

19          Now, you can explore a waiver of extradition and the

20  enforceability of it.  You can talk with the government.  I

21  think that would be a new condition that was unknown to you and

22  you could bring the matter back.  I am not trying to give you

23  false hope.

24          MR. KREISS:  Sure.

25          THE COURT:  That is knowledge that we don't have

1   today.

2          MR. KREISS:  Would you consider a corporate surety

3   bond?  On a $100,000 corporate surety bond her family would

4   have to pay a premium of $15,000.

5          THE COURT:  The problem is with that -- because to me

6   it seems the place she would go to if she is going to go is

7   Israel, and the problem is if she gets there, there is no

8   extradition, and no bounty hunter is going to get her out of

9   there, I don't think.

10          I have been through this with somebody I let out on a

11   very big bond who took off, and there was enough of a corporate

12   surety bond that I learned a lot about kind of -- I think I

13   learned some things about how that works.

14          I think there is no reasonable set of conditions that

15   will -- no set of conditions that will reasonably assure me

16   that Ms. Kol will appear.  I am not talking about danger to the

17   community.  I am talking about the lower burden of proof, a

18   preponderance, not a bond that I could set, and the combination

19   is the nature of the charges, the strength of the evidence, the

20   likelihood of conviction that goes with the strength of the

21   evidence, the long period of incarceration, the methamphetamine

22   dependency.

23          She is in pretty deep in dealing in methamphetamine

24   and apparently other drugs, and what I think would be

25   protection for her if she got to Israel.  All those things put

 1   together, those are my reasons for ordering detention.

 2          MR. KREISS:  Would a halfway house --

 3          THE COURT:  No.

 4          MR. KREISS:  -- suffice for protection of her

 5   appearance in court?

 6          THE COURT:  No, because people all the time walk out

 7   of halfway houses.  That's the problem.  I have seen too many

 8   of them on supervised release violations unsuccessfully

 9   discharged.  They just don't do it anymore.

10          MR. KREISS:  OK.

11          THE COURT:  I know it is a tough one.  Let me say

12   this.  You did a great job.  I couldn't have done this just

13   waltzing in here today and making the argument.

14          MR. KREISS:  Thank you.

15          THE COURT:  I mean it.  I mean it.  You have a good

16   lawyer.  The fact that he didn't convince me is not a

17   reflection on your lawyer, for what that's worth to you.

18          So that's it.

19          MR. KREISS:  I am going to go do some research.

20          THE COURT:  Would you please by Monday send me a

21   proposed order using the AO's form, detention form, in Word --

22   you can step down from the witness stand.

23          (Witness excused)

24          THE COURT:  The AO's form in a Word version so that I

25   can edit it.  Please don't do it on a PDF.  You want to lay out

```
 1   the factual basis only on risk of flight, not on danger.

 2              MS. COMOLLI:  Only on risk of flight.  Yes, your

 3   Honor.

 4              THE COURT:  OK.  We are adjourned.

 5              MR. KREISS:  Thank you, your Honor.

 6              MS. COMOLLI:  Thank you, your Honor.

 7              MR. KREISS:  Thank you for your time and your

 8   patience.

 9              THE COURT:  It's important.  It's important.

10              (Adjourned)

11

12                      C E R T I F I C A T E

13

14       I hereby certify that the foregoing is an accurate

15   transcription to the best of my ability of the digital audio

16   recording in the above-entitled matter.

17

18   January 1, 2023          s/ Joanne Mancari
                              Joanne Mancari, RPR, CRR, CSR
19                            Court Reporter
                              jemancari@gmail.com
20

21

22

23

24

25
```